EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Comisionado de Seguros de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Corporación para la Defensa del Poseedor de Licencia de Armas de Puerto Rico, Inc.<br><br>Peticionario | Certiorari<br><br>2019 TSPR 116<br><br>202 DPR ____ |

Número del Caso:  CC-2017-423


Fecha: 21 de junio de 2019


Tribunal de Apelaciones:


    Región Judicial de San Juan – Fajardo, Panel I


Abogado de la parte peticionaria:

    Lcdo. Luis A. González Ríos


Oficina del Procurador General:

    Lcdo. Luis R. Román Negrón
    Procurador General

    Lcdo. Guillermo A. Mangual Amador
    Procurador General Auxiliar


Materia: Seguros - Código de Seguros no reglamenta los planes de servicios legales grupales y prepagados.
Derecho Constitucional - El derecho a asociarse para procurar representación legal es una de las libertades fundamentales protegidas por la cláusula del debido proceso de ley aplicable a nuestra jurisdicción ex proprio vigore


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Comisionado de Seguros de
Puerto Rico

    Recurrido

       v.                  CC-2017-423     *Certiorari*

Corporación para la Defensa
del Poseedor de Licencia de
Armas de Puerto Rico, Inc.

    Peticionario

El Juez Asociado SEÑOR FELIBERTI CINTRÓN emitió la opinión del Tribunal.

En San Juan, Puerto Rico, a 21 de junio de 2019.

Tenemos ante nuestra consideración una pugna trabada entre la *Corporación para la Defensa del Poseedor de Licencia de Armas de Puerto Rico, Inc.* (CODEPOLA o peticionaria) y la Oficina del Comisionado de Seguros de Puerto Rico (OCS o recurrida). La primera ofrece a sus miembros, entre otros servicios, una membresía a cambio de gestionar y costear su representación legal en asuntos administrativos y judiciales relacionados con el uso legítimo de sus licencias y armas de fuego. De otra parte, la segunda considera dicha actividad como la venta desautorizada de pólizas de seguro. Por los fundamentos que discutimos a continuación, respondemos que la aludida práctica, aunque con

características similares a un seguro, no está contemplada dentro de nuestro ordenamiento como tal. Además, reconocemos que la práctica de organizaciones intermediarias de alentar a sus miembros a vindicar sus derechos, subsidiarles la representación legal o recomendar a determinados abogados para que les brinden la misma, es un **derecho fundamental** protegido por las garantías constitucionales de la libertad de expresión, de asociación y del derecho a peticionar al gobierno la reparación de agravios. Veamos.

## I.    Trasfondo fáctico y procesal

El 8 de junio de 2015, se presentó ante la OCS una solicitud de investigación de forma anónima (solicitud anónima). Según la solicitud anónima, CODEPOLA —una entidad con fines de lucro, debidamente registrada y organizada bajo las leyes de Puerto Rico— ofrecía una membresía a cambio de proveer asistencia legal para la defensa de los miembros poseedores de licencias de armas que necesitaran defender el uso legítimo o la tenencia de las mismas. De la solicitud anónima surge, entre otros asuntos, que CODEPOLA cobraba cuotas mensuales, anuales o quinquenales, a cambio de facilitar diversos beneficios, muchos de los cuales se proporcionan ante la ocurrencia de un suceso incierto. Estos beneficios incluían servicios de representación legal en procedimientos administrativos y judiciales relacionados con la revocación de licencias o la ocupación de armas de fuego. De otra parte, en la solicitud anónima se detalla

que en la página cibernética de la peticionaria, a pesar de ésta indicar que su servicio no es un seguro, en algún momento lo catalogó como tal.[1] Consecuentemente, se planteó que CODEPOLA no contaba con autorización de la OCS para expedir pólizas de seguros, cobrar primas, ni cumplía con los requisitos de capitalización necesarios para ello. Por cuanto, se le solicitó a la OCS que emitiera una orden de cese y desista en contra de la peticionaria y se le impusieran las multas correspondientes por operar ilícitamente como aseguradora.

El 2 de diciembre de 2015, la OCS notificó una *Orden de cese y desista* luego de concluir que los servicios ofrecidos por CODEPOLA constituían un contrato de seguro de

---

[1]    Específicamente, las preguntas cuatro (4) y cinco (5) de la sección de preguntas frecuentes leían de la siguiente manera:

> .    .    .    .    .    .    .    .

> 4. [¿]Esto es un **seguro**?

>> a. **No**. Esto es un servicio legal que est[á]s adquiriendo durante la vigencia de tu licencia de armas, completamente privado y con la representación legal de abogados expertos en la [L]ey [Núm.] 404.

> 5. [¿]De no interesarme el **seguro** que me puede pasar?
>> a. **Nunca sabrás cu[á]ndo estarás expuesto a tener una situación en la que tengas que [u]tilizar tu arma de fuego** o la Policía por desconocimiento o elitismo quiera ocupar tus armas. Por la experiencia de casos recientes hemos visto como ciudadanos han tenido que pagar sumas ascendentes a no menos de [cinco mil dólares ($5,000.00)] y hasta más y al día de hoy no han recuperado sus armas de fuego. La pregunta que debes hacerte es: [¿]Quiero tener un servicio que me garantice una tranquilidad o deseo perderlo todo por no tener al abogado experto en la materia? [¿]Tendré el dinero disponible? (Énfasis suplido). *Solicitud de investigación*, Apéndice, pág. 62.

conformidad con lo dispuesto en el Artículo 1.020 del Código de Seguros de Puerto Rico, *infra*.

En desacuerdo, CODEPOLA presentó una *Solicitud de vista e impugnación a contención del Comisionado de[] Seguros de Puerto Rico*. A través de su escrito, negó todas las alegaciones esbozadas por la OCS. Además, levantó como defensa afirmativa que se le estaba violando su derecho a la protección constitucional sobre la igual protección de las leyes, ya que, a su juicio, existían varias asociaciones de policías y de guardias de seguridad que brindaban a su matrícula servicios idénticos a los ofrecidos por ésta. Finalmente, rechazó que se dedicara a emitir un seguro para sus miembros, sino que, más bien, facilitaba un servicio legal rentado en forma de iguala,[2] además de seminarios educativos.[3]

La Oficial Examinadora de la OCS señaló una vista administrativa. No obstante, las partes solicitaron conjuntamente prescindir del señalamiento y que se les permitiera someter el caso mediante memorandos de derecho.

Conforme a lo anterior, el 4 de febrero de 2016 la Oficial Examinadora de la OCS dejó sin efecto la vista

---

[2] El contrato de iguala se define como un "[c]onvenio entre un profesional y un cliente mediante el cual aquél presta a éste sus servicios a cambio del pago de una cantidad mensual o anual". I. Rivera García, <u>Diccionario de términos jurídicos</u>, 3ra ed., San Juan, Lexis Publishing, 2000, pág. 125.

[3] Ante las imputaciones de que los servicios ofrecidos eran un seguro, CODEPOLA argumentó lo siguiente: "[s]i fuera como dice el Comisionado entonces todos los abogados que tienen igualas tendrían que tener licencias de seguros porque para lo que contrataron aún no se ha dado, existe una expectativa real de litigación, pero los casos surgen en el camino".

administrativa. Acto seguido, concedió a las partes hasta el 4 de marzo de 2016 para que presentaran memorandos de derecho y no más tarde del 18 del mismo mes y año para replicar.

El 4 de marzo de 2016, las partes presentaron sendos memorandos de derecho esbozando sus respectivas posiciones. Por su parte, CODEPOLA recalcó que no provee seguros sino la contratación de servicios legales en forma de iguala. Sostuvo, en síntesis, que sus miembros reciben a un precio reducido los servicios legales y notariales desde el momento en que se suscriben sin la necesidad de la ocurrencia de un suceso incierto, además de seminarios educativos y otros servicios relacionados a la obtención de licencias de portación de armas. Insistió en que es de conocimiento general en Puerto Rico la existencia de varias asociaciones de policías y guardias de seguridad que prestan servicios idénticos a los que ésta ofrece.[4]

De igual forma, la OCS presentó un *Memorando de derecho* y reiteró, en síntesis, que los servicios ofrecidos por CODEPOLA constituían contratos de seguros a tenor con lo dispuesto en el Artículo 1.020 del Código de Seguros de Puerto Rico, *infra*. Para sostener su postura, específicamente adujo que el producto que tramita CODEPOLA

---

[4]    CODEPOLA mencionó ejemplos de otras organizaciones que proveen servicios similares, entre estas: la Corporación Organizada de Policías y Seguridad (COPS), el Frente Unido de Policías Organizados de Puerto Rico Inc. (FUPO) y el Concilio Nacional de Policías (CONAPOL). Aclaró que, a diferencia de estas entidades, CODEPOLA cuenta con abogados "in house" y abogados asociados. Asimismo, anejó como ejemplos varios contratos de servicios de la FUPO y CONAPOL.

> […] es un contrato mediante el cual una persona (CODEPOLA[]), se obliga a indemnizar a otra (comprador o socio), a proveerle un beneficio específico o determinable (defensa y gastos de servicios legales y notaría, según sea el caso), al producirse un suceso incierto previsto en el mismo (necesidad de defensa por algún cuestionamiento en cuanto a la legítima tenencia de su arma o de su desempeño en el uso legítimo de ésta). El suceso incierto es la necesidad que pudiera tener el socio/comprador por razón de la portación o uso de su arma de fuego[,] anual o por cinco (5) años, dispuesto en el contrato, que adquiere el consumidor mediante el pago mensual tras completar la Solicitud de Ingreso que requiere CODEPOLA[]. El beneficio que dará CODEPOLA[] al socio lo hará como indemnización por razón de la ocurrencia de un hecho incierto, o causa fortuita, que específicamente nombra el contrato, a saber, algún problema legal que pudiera tener el socio por razón de su portación o uso de su arma de fuego durante la vigencia del contrato. Además, cabe resaltar que el beneficio que CODEPOLA[] se compromete a brindar a sus socios de ocurrir un evento de los contemplados en el contrato, puede ser de una cantidad mayor a la que pagó el socio al comprar el producto, a saber, $20.00 mensuales, $240.00 anual[es] o $1,200.00 por cinco (5) años.

Asimismo, la OCS argumentó que la membresía ofrecida por CODEPOLA no podía enmarcarse como una iguala o contrato de servicios profesionales entre abogado y cliente. Ello, debido a que, entre otras razones, la relación abogado-cliente se basa "en la confianza y en la atención personalizada y diligente que requiere la necesidad planteada por el cliente". Añadió que de la referida membresía "no surge la obligación del abogado, los términos de dicha representación legal ni las obligaciones del cliente". Alegó, a su vez, que la cantidad cobrada mensualmente por concepto de membresía no era cónsona con

los precios de una representación legal en Puerto Rico y que las igualas no contemplaban brindar tarjetas de membresía con descuentos u ofrecer educación sobre temas de interés.

En cumplimiento con la orden emitida por la Oficial Examinadora de la OCS, el 4 de febrero de 2016 la agencia presentó su réplica oportunamente, pero no así CODEPOLA. A pesar de ello, el 28 de marzo de 2016, ésta última sometió ante la OCS una *Moción al efecto de que se tome conocimiento administrativo en destaque de la posición de CODEPOLA PR*. Por medio de ese escrito, alegó, en lo pertinente, que la disposición del Código de Seguros que la OCS aplicó en su caso era inconstitucional por adolecer de vaguedad.

Posteriormente, el 15 de junio de 2016, la OCS notificó una *Resolución* a través de la cual confirmó la *Orden de cese y desista* que dicha agencia emitiera. Concluyó que CODEPOLA había tramitado seguros en Puerto Rico sin estar autorizada como aseguradora, en contravención a las disposiciones "claras y expresas del Código de Seguros de Puerto Rico".

Inconforme, el 5 de julio de 2016, CODEPOLA presentó una solicitud de reconsideración en virtud de la cual reiteró su posición de que el estatuto concernido adolecía de vaguedad. Luego de varios trámites procesales, la representación legal de la OCS se opuso a la misma por los mismos argumentos expuestos en su *Memorando de derecho*. Así las cosas, el 12 de agosto de 2016, la OCS notificó la denegatoria de la solicitud de reconsideración.

En desacuerdo, el 12 de septiembre de 2016 CODEPOLA acudió ante el Tribunal de Apelaciones mediante un recurso de revisión judicial. Como único error, CODEPOLA señaló que:

> [LA COMISIONADA DE SEGUROS ERRÓ] AL NO RESOLVER QUE LA ORDEN DE CESE Y DESISTA ESTÁ CONFIGURADA SOBRE UNA LEY EXTRAORDINARIAMENTE VAGA Y AMPLIA QUE PERMITE EN SU APLICACIÓN UNA BARRIDA SIN LÍMITES, SIN ESTÁNDARES SOBRE CUALQUIER ACTIVIDAD LEGÍTIMA DE SERVICIOS LEGÍTIMOS, CONVIRTIENDO TODA ACTIVIDAD RENTADA SOBRE SITUACIONES EMERGENTES EN UN[] SEGURO, COSA QUE EN DERECHO ES IMPERMISIBLE Y VIOLATORIA DEL DEBIDO PROCESO DE LEY EN SU FORMA SUSTANTIVA, MÁS CUANDO LA COMISIONADA ES JUEZ Y PARTE.[5]

Tras varias incidencias procesales y la comparecencia en oposición de la OCS representada por la Oficina del Procurador General, el Tribunal de Apelaciones notificó *Sentencia* el 6 de marzo de 2017. El dictamen del foro apelativo intermedio confirmó la determinación de la agencia. Particularmente, dispuso que la OCS actuó correctamente en derecho y que sus actuaciones estuvieron dentro de los poderes y facultades atribuidas por ley. Respecto al planteamiento de vaguedad del estatuto esgrimido por CODEPOLA, el foro apelativo intermedio se limitó a indicar que ésta no identificó la disposición legal sobre la cual cimentaba su argumento, ni presentó evidencia que

---

[5]   CODEPOLA planteó que la disposición del Código de Seguros en la que se funda la postura de la OCS adolece de vaguedad. Asimismo, cuestionó que tanto la *Orden de cese y desista* como la *Resolución* posterior confirmándola fueron emitidas por la misma persona, a saber, la Sra. Ángela Weyne Roig, Comisionada de Seguros. Sin embargo, dada la disposición del recurso, y los fundamentos que presentaremos a continuación, no es preciso atender estas controversias.

derrotara la presunción de regularidad y corrección que cobijaba la determinación administrativa.

Aún insatisfecha, el 21 de marzo de 2017 CODEPOLA solicitó reconsideración ante el Tribunal de Apelaciones, mas su petición fue denegada mediante *Resolución* notificada el 19 de abril de 2017.

El 19 de mayo de 2017 CODEPOLA recurrió ante nosotros y repitió el señalamiento de error planteado ante el foro apelativo intermedio.

El 1 de diciembre de 2017 expedimos el auto de *certiorari* solicitado. Por contar con el beneficio de los alegatos de ambas partes, procedemos a resolver.

## II. Derecho aplicable

### A. Jurisdicción

La *jurisdicción* es el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir los asuntos sometidos ante su consideración. Fuentes Bonilla v. Estado Libre Asociado de Puerto Rico, 2018 TSPR 98, pág. 7, 200 DPR ___ (2018); CIC Const. v. JMSP-UPR, 196 DPR 964, 972 (2016); Ayala Hernández v. Consejo Titulares, 190 DPR 547, 559 (2014); DACo v. AFSCME, 185 DPR 1, 12 (2012). En un sinnúmero de ocasiones hemos reiterado que los organismos administrativos, al igual que los tribunales, no tienen discreción para asumir jurisdicción donde no existe. CIC Const. v. JMSP-UPR, *supra*, pág. 973; Ayala Hernández v. Consejo Titulares, *supra*; DACo v. AFSCME, *supra*. Ello, debido a que la autoridad conferida a una

entidad administrativa estará sujeta a la delegación de aquellos poderes que le hayan sido específicamente conferidos por la Asamblea Legislativa en su ley habilitadora. Ayala Hernández v. Consejo Titulares, *supra*; DACo v. AFSCME, *supra*; D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 3ra ed., Colombia, Ed. Forum, 2013, Sec. 2.1, págs. 35-36.

Cónsono con lo anterior, un organismo administrativo no podrá asumir jurisdicción sobre un asunto a menos que esté claramente autorizado en ley para ello. CIC Const. v. JMSP-UPR, *supra*, pág. 973; Ayala Hernández v. Consejo Titulares, *supra*; DACo v. AFSCME, *supra*. "Es decir, [una agencia] solo puede llevar a cabo las funciones que se le han encomendado legislativamente, aquellas que surgen de su actividad o encomienda principal y ejercer los poderes que sean indispensables para llevar a cabo sus deberes y responsabilidades". Ayala Hernández v. Consejo Titulares, *supra*, pág. 60. Consecuentemente, las agencias administrativas no pueden actuar más allá de los poderes que le fueron delegados en el estatuto habilitador, "de manera que toda actuación administrativa que no obedezca el poder que le fue conferido mediante legislación debe catalogarse como **ultra vires, y por ende, nula**". (Énfasis suplido). Ayala Hernández v. Consejo Titulares, *supra*, pág. 60. Véase, además, CIC Const. v. JMSP-UPR, *supra*, pág. 973; DACo v. AFSCME, *supra*, pág. 13.

**B. Revisión judicial de determinaciones administrativas**

Sabido es que las decisiones de los organismos administrativos están revestidas de una presunción de regularidad y corrección. Mun. de San Juan v. CRIM, 178 DPR 163, 175 (2010). Esto debido a que, mediante esta norma "reconocemos el *expertise* del que gozan los organismos administrativos en aquellas materias que le han sido delegadas por ley". OCS v. Universal, 187 DPR 164, 178 (2012); The Sembler Co. v. Mun. de Carolina, 185 DPR 800 (2012). Por ello, "[l]as conclusiones de estas agencias merecen gran deferencia por parte de los tribunales, por lo que debemos ser cuidadosos al intervenir con las determinaciones administrativas". González Segarra *et al*. v. CFSE, 188 DPR 252, 276 (2013). No obstante, la deferencia hacia una decisión de una agencia administrativa cede si no está basada en evidencia sustancial, ha errado en la aplicación de la ley, o ha mediado una actuación irrazonable o ilegal. The Sembler Co. v. Mun. de Carolina, *supra*, pág. 822; Otero v. Toyota, 163 DPR 716, 729 (2005).

De acuerdo con la Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme vigente entonces, los tribunales no intervendremos con las determinaciones de hechos formuladas por una agencia, siempre que estas se sostengan por evidencia sustancial que forme parte del expediente administrativo. 3 LPRA ant. sec. 2175. Por el contrario, las conclusiones de derecho de un organismo administrativo

podrán ser examinadas por los tribunales en todos sus aspectos. The Sembler Co. v. Mun. de Carolina, *supra*.

### C. El Código de Seguros

Los gobiernos poseen amplia facultad para escoger el método que consideren más adecuado para reglamentar y supervisar el negocio de seguros en su jurisdicción, a fin de proteger el interés público. Para cumplir con ese objetivo, establecen tarifas uniformes, ponen en vigor leyes pertinentes y velan porque las violaciones a la legislación en el campo de seguros se atiendan adecuadamente. OCS v. Universal, *supra*, pág. 175; 1 *Couch on Insurance 3d* Sec. 2:7, pág. 2-41 ("The extent of the authority granted to the regulatory body varies from jurisdiction to jurisdiction, and authority may be granted to address a specific, narrow area of insurance that concerns the state at a given time."). Por cuanto, cada entidad reguladora será diferente y estará dotada de las facultades que le hayan sido conferidas mediante su ley orgánica. OCS v. Universal, *supra*; *Couch on Insurance 3d*, *supra*, Sec. 2:7, pág. 2-41. No obstante, la autoridad conferida al Comisionado estará generalmente circunscrita a los términos suscritos en su estatuto orgánico, por lo que carecerá de poder para regular funciones no contempladas en la misma. *Couch on Insurance 3d*, *supra* ("[T]he authority granted to the commission will generally be circumscribed by the terms of the underlying statute, with the commission not empowered to perform

regulatory functions beyond the scope of that grant of authority […]").

En cuanto a nuestra legislación de seguros, surge del Historial Legislativo que se originó a solicitud de la Superintendencia de Seguros, allá para el 1950. El mismo recoge el fruto de la experiencia obtenida en diferentes Estados de la Unión, y en otras regiones del hemisferio, incluyendo, desde luego, la propia experiencia de Puerto Rico. IX (Núm. 42) Diario de Sesiones de la Asamblea Legislativa (Senado) 561 (1957); Casanova v. PR-Amer. Ins. Co., 106 DPR 689, 693 (1978). "En el proceso de su adopción se revisó la legislación sobre seguros de diferentes Estados, de países latinoamericanos, de Filipinas y de Canadá, para beneficiarse de las experiencias de otras áreas y lograr la mejor legislación que se adaptase a nuestras particulares necesidades". Casanova v. PR-Amer. Ins. Co., supra, pág. 693; Diario de Sesiones, supra, pág. 563. De esta manera se procuró que los asegurados en Puerto Rico estuviesen mejor protegidos, la industria pudiese desarrollarse con mayor facilidad, la superintendencia pública pudiera ejercerse con mayor eficiencia y se fomentara el desarrollo económico y social del país. Diario de Sesiones, supra, pág. 561.

Concretamente, con relación a los poderes y responsabilidades del Comisionado, el Historial Legislativo del referido estatuto expresa que en el mismo se definen "claramente los poderes y responsabilidades del Comisionado

de Seguros y se establecen claramente los procedimientos que ha de usar para descargar su responsabilidad oficial". Diario de Sesiones, *supra*, pág. 562. Entre estas facultades se incluyen el examinar compañías, realizar investigaciones y conducir vistas públicas. Íd. Asimismo, el informe expresó que con las enmiendas propuestas la autoridad del Comisionado se ampliaba y se definía, de forma más precisa y abarcadora, el concepto de lo que es un seguro. En específico el informe lee como sigue:

> La ley orgánica de seguros que proponemos cubre los aspectos fundamentales del negocio del seguro en forma más clara, más amplia y más específica que la ley actual. **Cualquier persona o entidad que lleve a cabo actividades de seguro cae bajo el poder de reglamentación del Comisionado y bajo la Ley. Los poderes del Comisionado se amplían y fortalecen y se define en forma más precisa y abarcadora el concepto de lo que es seguro. Por falta de una disposición adecuada en la ley vigente — disposición que ahora se incluye en el Sustantivo del P. de la C. 1174— distintas instituciones y personas, particularmente las que se dedican a ofrecer servicios médicos y de hospital a <u>base de cuotas, están fuera del poder de reglamentación del Superintendente de Seguros</u>**. (Negritas y subrayado nuestro). Íd.

Así pues, vemos que la práctica de ofrecer servicios profesionales —en este caso de naturaleza médica— a cambio del pago de una cuota, estaba fuera del alcance del Comisionado.[6] A pesar de que, al presente, las

---

[6] El Informe conjunto de las Comisiones de Hacienda y de lo Jurídico sobre el P. de la C. 1174, para la aprobación del nuevo Código de Seguros de Puerto Rico, fue leído en la Cámara de Representantes el 18 de abril de 1956. El mismo, destaca la participación del entonces Secretario de Justicia, Dr. José Trías Monge y de los oficiales jurídicos del Departamento de Justicia. El  27 de abril de 1956 se emitió la Opinión del Secretario de Justicia Núm. 1956-26. El Secretario de Justicia atendió una petición del entonces Superintendente de Seguros, Sr. Mariano Nieves Hidalgo, relacionada a una consulta legal. Éste último

organizaciones de cuidado de salud se encuentran reguladas por el Capítulo 19 del Código de Seguros,**7** este tipo de contrato de servicios profesionales médicos generalmente no es considerado como uno de seguros. Véase *Couch on Insurance 3d*, *supra*, Secs. 1:21, págs. 1-48, 1-49.**8** A esos efectos, resulta reveladora la definición de los planes de cuidado de salud. Conforme a la misma, este tipo de convenio entre

---

interesaba conocer si un contrato suscrito por un doctor y la Autoridad de Puertos de    Puerto Rico, para la prestación de ciertos servicios médicos a los empleados de dicha corporación, constituía un negocio de seguros a base de los estatutos vigentes entonces. El Secretario de Justicia examinó la antigua Ley de Seguros (26 LPRA ant. secs. 1 *et seq*.), el derogado Art. 1691 del Código Civil de Puerto Rico (31 LPRA ant. sec. 4751), así como varios tratadistas y jurisprudencia norteamericana. Luego de un estudio de las fuentes anteriores, y en lo que respecta a los contratos de seguros, concluyó que "**la característica esencial del contrato de seguros, tal como se define en nuestros estatutos, es la obligación de indemnizar a la parte asegurada por las consecuencias dañosas de ciertos riesgos a que puedan hallarse expuestos sus bienes o su persona, según se determine en el contrato**". (Énfasis nuestro). Opinión del Secretario de Justicia Núm. 1956-26, pág. 105. Con respecto a ese tipo de acuerdo, el Secretario de Justicia concluyó lo siguiente:

.    .    .    .    .    .    .    .

> **Tal contrato, a mi entender, no tiene como finalidad una indemnización por consecuencias dañosas de ciertos riesgos de carácter fortuito, lo cual, a mi entender, lo excluye de la naturaleza y las características que indiscutiblemente le darían el carácter de negocio de seguros, tal como éste se contempla en nuestros estatutos.** […] (Énfasis suplido). Íd.

**7** Véanse Arts. 19.010-19.028, Código de Seguros de Puerto Rico, 26 LPRA secs. 1901-1928.

**8** En particular, el estado actual de estos acuerdos es el siguiente:

> Professional service agreements (usually involving health care) are generally not considered to be contracts of insurance. This conclusion may be based on an assessment that risk transfer is minimal compared to the element of health care, or, more often, on the fact that the plan at issue involves no hazard or peril as contemplated by an applicable statute which defines the term "insurance," because the contract merely entitles participants to services or supplies at free or reduced rates. This is especially true when the health care provider charges a fee for each service which is at or above the provider's cost, since this removes any element of risk from the arrangement. 1 *Couch on Insurance 3d* Secs. 1:21, págs. 1-48, 1-49.

las partes, aunque regulado dentro del Código de Seguros,

se caracteriza como uno cuyo fin primordial es la prestación

de servicios de cuidado de salud y **no** la indemnización por

el costo de tales servicios ante la ocurrencia de un suceso

incierto. En detalle, la disposición lee así:

.    .    .    .    .    .    .    .

> 4) *Plan de cuidado de salud.* — Significa cualquier convenio mediante el cual una persona se compromete a proveer a un suscriptor o grupo de suscriptores determinados servicios de cuidado de salud bien sea directamente o a través de un proveedor, o a pagar la totalidad o una parte del costo de tales servicios, en consideración al pago de una cantidad prefijada en dicho convenio que se considera devengada independientemente de si el suscriptor utiliza o no los servicios de cuidado de salud provistos por el plan. **No obstante lo anterior, dicho plan deberá proveer principalmente para la prestación de servicios de cuidado de salud, a distinción de la mera indemnización por el costo de tales servicios.** (Énfasis suplido). Art. 19.020(4), Código de Seguros de Puerto Rico, 26 LPRA sec. 1902(4).

En cuanto a la facultad delegada al Comisionado, el

Código de Seguros le autoriza a velar por el cumplimiento

de las disposiciones que resulten expresas o razonablemente

implícitas del estatuto. Art. 2.030(1), Código de Seguros

de Puerto Rico, 26 LPRA sec. 235(1). Éste deberá, entre

otras cosas, proteger adecuadamente "el interés público

[para que] responda a las necesidades de los tiempos y a los

cambios que ocurran o se anticipen en la industria de seguros

y en su reglamentación". Art. 2.030(2), Código de Seguros

de Puerto Rico, 26 LPRA sec. 235(2). Asimismo, "podrá

interponer cualesquiera remedios, acciones o procedimientos

legales que fueran necesarios o convenientes para hacer efectivos los propósitos de este Código o cualquier ley o reglamento, cuyo cumplimiento o fiscalización **le haya sido asignada** […]". (Énfasis nuestro). Art. 2.030(3), Código de Seguros de Puerto Rico, 26 LPRA sec. 235(3).[9]

De otra parte, el Código de Seguros dispone que ninguna persona actuará como asegurador sin la autorización previa del Comisionado. Art. 3.020, Código de Seguros de Puerto Rico, 26 LPRA sec. 303.[10] Cónsono con las facultades conferidas al Comisionado, el estatuto le autoriza a que, previa notificación y vista, así como en beneficio del interés público, emita órdenes de cese y desista en contra de personas que realicen prácticas prohibidas por el Código o contra personas que se dediquen al negocio de seguros y que éste juzgue que están empleando métodos o prácticas de

---

[9] A diferencia de la práctica de servicios cuestionada en el presente caso por la OCS, el Código de Seguros categóricamente le confiere autoridad y jurisdicción al Comisionado sobre las organizaciones de servicios de salud. Específicamente, el Código de Seguros crea una presunción de que "toda persona, entidad u organización que provea en Puerto Rico cubierta de clase alguna sobre una base prepagada por gastos por servicios médico[s]" estará sujeta a la jurisdicción y reglamentación del Comisionado. Art. 19.031(1), Código de Seguros de Puerto Rico, 26 LPRA sec. 1903a(1).

[10] Para operar como organizaciones de servicios de salud, las entidades deben cumplir con múltiples requerimientos de ley y, una vez evaluadas y aprobadas por el Comisionado, éste expedirá un certificado de autoridad el cual podrá ser suspendido o revocado en caso de incumplimiento con las disposiciones de este Capítulo. Véanse Arts. 19.030-19.230, Código de Seguros de Puerto Rico, 26 LPRA secs. 1903-1923. Ahora bien, el Código de Seguros hace la salvedad de que las organizaciones de servicios de salud autorizadas no son las que practican la medicina y, por tanto, estarán exentas de cumplir con las normas de dicha práctica. **Es decir, distingue entre la organización de servicios de salud y los profesionales de la medicina que finalmente proveen el servicio.** ("Cualquier organización de servicios de salud autorizada por este capítulo **no se considerará que practica la medicina y estará exenta de las disposiciones relacionadas con la práctica de la medicina**".). (Énfasis suplido). Art. 19.240(2), Código de Seguros de Puerto Rico, 26 LPRA sec. 1924.

competencia desleales, injustas o engañosas. Art. 2.150, Código de Seguros de Puerto Rico, 26 LPRA sec. 247. Igualmente, le autoriza a emitir una orden provisional de cese y desista sin celebración de una vista previa, "cuando exista una situación que cause o pueda causar peligro inminente para la salud, seguridad o bienestar público o que requiera acción inmediata de la Oficina". Art. 2.150(3), Código de Seguros de Puerto Rico, 26 LPRA sec. 247(3). En estos casos, la orden "expresará una concisa declaración de las razones de política pública que justifican la actuación de la Oficina". Íd.

### D. Contrato de seguro

El seguro constituye "un acuerdo mediante el cual las partes se comprometen a compensar a otra por una **pérdida** ocasionada a causa de una contingencia en particular". (Énfasis nuestro). Savary *et al.* v. Mun. Fajardo *et al.*, 198 DPR 1014, 1023 (2017). Concretamente, el Art. 1.020 del Código de Seguros de Puerto Rico, 26 LPRA sec. 102, define el contrato de seguro como uno "mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". En resumen, a cambio del pago de una prima, se transfiere el riesgo de un evento específico a la aseguradora, quien viene obligada a cubrir los daños económicos por los que el asegurado esté llamado a responder. Savary *et al.* v. Mun. Fajardo *et al.*, *supra*; Viruet *et al.* v. SLG Casiano-Reyes,

194 DPR 271, 278 (2015). Véase, además, *Couch on Insurance 3d*, *supra*, Sec. 1:6, págs. 1-16, 1-17, 1-18.

Como norma general, los contratos de seguro tienen como característica esencial la obligación de indemnizar. Indemnizar se define como la acción de resarcir de un daño o perjuicio. I. Rivera García, <u>Diccionario de términos jurídicos</u>, 3ra ed., San Juan, Lexis Publishing, 2000, pág. 125. Véase *Couch on Insurance 3d*, *supra*, Secs. 1:7, pág. 1-18 ("The word 'indemnity' is defined as 'security or protection against hurt or loss or damage,' and, in simple legal terms, indemnity can be said to 'secure against future loss or damage.'"); *Couch on Insurance 3d*, *supra*, Secs. 1:10, pág. 1-25 ("The contract's primary character is that of indemnity, in the sense that the party insured is entitled to compensation for such loss as has been occasioned by the perils insured against […]"). Asimismo, otro requisito esencial de un contrato de seguro es la asunción de un riesgo de pérdida y el compromiso de asegurar contra dicha pérdida. *Couch on Insurance 3d*, *supra*, Sec. 1:9, pág. 23 ("The primary requisite essential to a contract of insurance is the assumption of a risk of loss and the undertaking to indemnify the insured against such loss.").

Por su parte, el Art. 1.030 del Código de Seguros define asegurador como la persona —ya sea una asociación, grupo, sindicato, organismo, compañía, corporación, persona jurídica o entidad— que se dedique al negocio de otorgar contratos de seguro, organizada con fines pecuniarios o sin

ellos.  Art. 1.050, Código de Seguros de Puerto Rico, 26 LPRA sec. 105.  Este último artículo contempla la solicitación y persuasión como actos constitutivos de contratación de seguro.  Íd.  Finalmente, dicho estatuto categóricamente prohíbe que una persona se dedique al negocio de seguros en Puerto Rico, sin cumplir con las disposiciones del Código.  Art. 1.060, Código de Seguros de Puerto Rico, 26 LPRA sec. 106.

### E. Servicios legales grupales y prepagados (*Group and Prepaid Legal Services* (GPLS))

La práctica de ofrecer a los miembros de una organización planes de protección que provean representación legal en situaciones de necesidad se denomina servicios legales grupales y prepagados, mejor conocida en inglés como *Group and Prepaid Legal Services* (GPLS).  Los planes de GPLS tienen una larga historia constitucional en los Estados Unidos, sobre la cual abundaremos en detalle más adelante.  Por el momento, para propósitos de clasificar este tipo de servicio, basta señalar que, aunque no es un seguro, se ha reseñado que dichos planes poseen características similares a los mismos. Ello, dado que la necesidad de sus servicios a menudo está fuera del control de los miembros, así como del proveedor; se pagan primas por la protección; y el riesgo de requerir dichos servicios se dispersa a través de todos los miembros. *Couch on Insurance 3d*, *supra*, Sec. 1:21, pág. 1-49.

Ahora bien, los planes de servicios legales grupales y prepagados se distinguen de otros productos con mayor auge

en países europeos conocidos como seguros de gastos jurídicos o *legal expenses insurances*. Estos últimos productos, en efecto, son seguros operados por aseguradoras comerciales cuya cubierta se activa antes o después de la ocurrencia de un evento incierto para cubrir los gastos de litigación del asegurado. Véase L. F. Estrella Martínez, Acceso a la Justicia: Derecho Humano Fundamental, San Juan, Ed. SITUM, Inc., pág. 23 (citando a M. Cappelletti & B. G. Garth, *Access to Justice: The Newest Wave in the Worldwide Movement to Make Rights Effective*, 27 Buff. L. Rev. 181, 205-207 (1978); M. Kilian, *Alternative to Public Provision: The Role of Legal Expenses Insurance in Broadening Access to Justice: The German Experience*, 30 J. L. & Soc. 31, 33 (2003)). Véase, además, Cappelletti & Garth, *supra*, pág. 281.

Las principales diferencias entre ambos productos consisten en que:

> Primero, los servicios legales prepagados no aseguran al individuo contra pérdidas pecuniarias. Segundo, usualmente se utilizan para asuntos no relacionados con la litigación. Tercero, no necesitan la ocurrencia de un evento para detonar la cubierta de la póliza. Por último, usualmente, los servicios legales prepagados no son públicos, sino que forman parte de algún beneficio laboral. Estrella Martínez, *supra*, pág. 24 (citando a M. Kilian, *Alternative to Public Provision: The Role of Legal Expenses Insurance in Broadening Access to Justice: The German Experience*, 30 J. L. & Soc. 31, 36-37, esc. 27 (2003)).

Debido a su peculiaridad, varias jurisdicciones han optado por manejar los planes de GPSL como una modalidad de

práctica de la abogacía a través de una combinación de reglamentación por parte de los Tribunales Supremos estatales y la imposición de requisitos de inscripción con diversas entidades gubernamentales, tales como los organismos encargados de regular los asuntos en materia de seguro.[11]

### F. Derecho a asociarse para procurar representación legal

#### i. Estados Unidos

Como adelantáramos, el presente caso plantea, a nivel local, una vertiente novel de la práctica de la abogacía, pero con una amplia tradición en los Estados Unidos y que aún continúa en constante desarrollo. Según mencionamos, se trata de los planes de servicios legales grupales y prepagados o planes de GPLS. Por más de cincuenta (50) años la normativa concerniente a estos planes ha venido cristalizándose y transformando la forma en que se ofrecen servicios legales con el fin de lograr que la mayoría de los estadounidenses pobres o de clase media obtengan acceso a la justicia.[12] Para el 2001, entre un veinte (20) a un cuarenta (40) por ciento de los estadounidenses estaban

---

[11] Véase J. B. Tomes, *The Emergence of Group and Prepaid Legal Services: Embracing a New Reality*, 16 Transactions: Tenn. J. Bus. L. 25, 58-60 (2014). Véanse, como ejemplo, Tennessee Rules of Appellate Procedure, Tenn. Sup. Ct. R. 44; Tennessee Legal Insurance Act, Tenn. Comp. R. & Regs. 0780-01-60-.01 - 0780-01-60-.08. Véase, además, American Law Reports, *Prepaid legal services plans*, 93 ALR 3d 199 (publicación original de 1979).

[12] J. B. Tomes, *supra*, pág. 26.

cubiertos por algún plan de GPLS.[13] Además, muchos de estos programas forman parte de los paquetes de beneficios de algunas compañías grandes y de pequeños negocios.[14] Incluso, la *American Bar Association* (ABA) constituyó el *Standing Committee on Group and Prepaid Legal Services* y define esta práctica como aquellos planes que proveen un mecanismo eficiente para parear clientes/miembros necesitados de asistencia legal con abogados competentes y conocedores del área de derecho en cuestión.[15]

Conforme a la normativa prevaleciente en los Estados Unidos, estos planes, mediante los cuales organizaciones

---

[13] Íd., pág. 25 (citando a J. L. Maute, *Pre-Paid and Group Legal Services: Thirty Years After the Storm*, 70 Fordham L. Rev. 915, 916 (2001)).

[14] Íd.

[15] La *American Bar Association* (ABA) explica que estos modelos funcionan de forma similar a algunas prácticas de la industria de seguros de salud y lo promociona como una forma de hacer crecer la práctica legal de los letrados sin incurrir en demasiados gastos de mercadeo y sin la necesidad de facturar. En detalle, la ABA consigna en su portal cibernético lo siguiente:

> Group and Prepaid Legal Services plans provide an efficient mechanism for matching clients in need of services with lawyers. Group Legal Plans create panels of lawyers with expertise in various areas and match them with plan members/clients. The model is similar to a PPO ["Preferred Provider Organization"] in the health insurance industry. Clients find a lawyer with the appropriate skills on the panel and within the limits of the plan receive the legal services they need. The benefit for lawyers is that the bills are paid! In addition, when a lawyer establishes a relationship with a client, that client may return for services not covered under the plan, for which the lawyer may charge his or her regular rates. Many lawyers have created a thriving practice solely based on their participation with group legal services plans. Others have supplemented with just a few cases. Either way, group and prepaid legal services are a great way to grow your practice without marketing expenses or accounts receivable! *American Bar Association*, Standing Committee on Group and Prepaid Legal Services, https://www.americanbar.org/groups/group_prepaid_legal_services/ (última visita, 29 de octubre de 2018).

intermediarias refieren a sus miembros a abogados a través de contratos de iguala o, incluso, a abogados empleados por la propia organización, están protegidos constitucionalmente por los derechos a la libertad de expresión, asociación y a solicitar al gobierno la reparación de agravios de sus miembros ("petition the government for a redress of grievances"). Ello, al amparo de la Primera y Decimocuarta enmienda de la Constitución de los Estados Unidos.  Enmda. I, XIV, Const. EE. UU., LPRA, Tomo 1.

A continuación, para una mejor comprensión de la norma que adoptamos hoy, exponemos un recuento histórico de esta práctica. Veamos.

A mediados del siglo XX, las organizaciones caritativas, tales como las oficinas de ayuda legal, emprendieron los primeros esfuerzos de implementación de planes de GPLS al servir como intermediarias de sus miembros legos con escasos recursos económicos y procurarles servicios legales competentes y a bajo costo.[16]  Luego, el Tribunal Supremo de los Estados Unidos (TSEU o Tribunal Supremo federal) resolvió varios casos que forzaron a los Colegios de Abogados estatales y a la ABA a flexibilizar sus reglamentaciones éticas que prohibían las relaciones de los

---

[16]  J. B. Tomes, *supra*, pág. 27.

abogados con las organizaciones intermediarias de servicios legales.[17]

En el 1962, el Tribunal Supremo federal tuvo ante su consideración el caso de NAACP v. Button, 371 US 415 (1963). La *National Association for the Advancement of Colored People, Inc.* (NAACP) —entidad cuyos esfuerzos iban dirigidos a eliminar las barreras raciales de la segregación que privaban a los afroamericanos de sus privilegios y deberes como ciudadanos americanos— impugnó la constitucionalidad de un estatuto del Estado de Virginia y de ciertos Cánones de Ética Profesional que prohibían la solicitación de asuntos legales a través de individuos u organizaciones. Ello, por entender que esta normativa infringía las libertades protegidas por la Primera Enmienda, salvaguardadas de interferencia estatal por la Decimocuarta Enmienda.[18] Específicamente, la NAACP alegó que el estatuto violaba el derecho de la organización, sus miembros y abogados a asociarse con el propósito de procurar remedios ante infracciones de sus derechos constitucionalmente garantizados. NAACP v. Button, *supra*, pág. 428. El Tribunal Supremo de Apelaciones de Virginia dictaminó que el propósito de la legislación impugnada era reforzar los

---

[17]  J. L. Maute, *Pre-Paid and Group Legal Services: Thirty Years After the Storm*, 70 Fordham L. Rev. 915, 918 (2001).

[18]  El Capítulo 33 del Código de Virginia prohibía, entre otras actuaciones: "solicitation of legal business by a 'runner' or 'capper' to include, in the definition of 'runner' or 'capper,' an agent for an individual or organization which retains a lawyer in connection with an action to which it is not a party and in which it has no pecuniary right or liability". NAACP v. Button, 371 US 415, 423 (1963).

estatutos existentes para tener mayor control de los males

provocados por la solicitación de servicios legales ("evils

of solicitation of legal business"). Íd., pág. 424. Por

lo cual, concluyó que las actividades de la NAACP violaban

tanto la ley estatal como los Cánones de Ética Profesional

de Virginia adoptados tomando como modelo los antiguos

Cánones de Ética Profesional de la ABA. NAACP v. Button,

*supra*, págs. 424-426.

Posteriormente, el Tribunal Supremo federal revocó esta

decisión y sostuvo que la NAACP tenía un derecho

constitucionalmente protegido de asociarse políticamente

para poner a la disposición de sus miembros, abogados

dispuestos a atender reclamaciones de derechos civiles y en

contra de la segregación.[19]  En palabras del propio TSEU:

> We meet at the outset the contention that 'solicitation' is wholly outside the area of freedoms protected by the First Amendment. To this contention there are two answers. **The first is that a State cannot foreclose the exercise of constitutional rights by mere labels. The second is that abstract discussion is not the only species of communication which the Constitution protects; <u>the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion</u>.**
>
> .   .   .   .   .   .   .   .   .
>
> […] For there is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity. **Thus we have affirmed the right 'to engage in association for the advancement of beliefs and ideas.' We have deemed privileged, under certain circumstances, the efforts of a union official to organize workers.** […] And we have refused to countenance compelled disclosure of

---

[19]  Véase J. B. Tomes, *supra*, pág. 27.

a person's political associations in language closely applicable to the instant case:

> **'Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights.** Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups[…].'

> The NAACP is not a conventional political party; but the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, **makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society. For such a group, association for litigation may be the most effective form of political association.** (Énfasis nuestro y citas omitidas). Íd., págs. 429-432.

Así, tras reconocer como un derecho consagrado en la Primera Enmienda el derecho a asociarse para litigar y defender vigorosamente los ideales de un grupo con fines legítimos en contra de la intromisión indebida del gobierno, el TSEU concluyó específicamente que:

> […] Chapter 33 as construed violates the Fourteenth Amendment by unduly inhibiting protected freedoms of expression and association. […] As construed by the [Virginia Supreme Court of Appeals], Chapter 33, at least potentially, prohibits every cooperative activity that would make advocacy

> of litigation meaningful. If there is an
> internal tension between proscription and
> protection in the statute, we cannot assume
> that, in its subsequent enforcement,
> ambiguities will be resolved in favor of
> adequate protection of First Amendment rights.
> Broad prophylactic rules in the area of free
> expression are suspect. Precision of
> regulation must be the touchstone in an area
> so closely touching our most precious
> freedoms. (Citas omitidas). NAACP v. Button,
> *supra*, págs. 437-438.

Poco más de un año después, el Tribunal Supremo federal resolvió el caso de Brotherhood of Railroad Trainmen v. Virginia, 377 US 1 (1964). Mediante el mismo —a la luz de lo resuelto en NAACP v. Button, *supra*— volvió a atender la controversia de índole constitucional sobre si la práctica de una organización intermediaria, al tener Departamentos de Asesoría Legal que recomendaban a sus miembros y familiares los nombres de representantes legales que contaban con su aval, constituía una solicitación o práctica desautorizada de la abogacía o, en cambio, era una actividad legítima protegida constitucionalmente. En esta ocasión la entidad involucrada era la Hermandad de Trabajadores de los Ferrocarriles, una asociación fundada en el 1883 con el fin de promover el bienestar de los trabajadores de los ferrocarriles y sus familiares. Esta entidad disponía de un Departamento de Asesoría Legal dividido en dieciséis (16) regiones a través de los Estados Unidos mediante las cuales los miembros escogían abogados para que los representaran en reclamaciones por daños y lesiones laborales.

Brotherhood of Railroad Trainmen v. Virginia, *supra*, pág. 4. La Hermandad tenía como práctica, si un trabajador se lesionaba o moría, enviar a una secretaria de su región para que exhortara a éste, su viuda o hijos a que no transigieran la reclamación sin antes asesorarse con uno de los abogados recomendados por ésta. Íd. Este proceder fue impugnado por el Colegio de Abogados de Virginia, quienes prevalecieron ante el Tribunal de Cancillería. Dicho foro emitió un *injunction* prohibiendo el curso de acción antes descrito por considerarlo un acto de solicitación ilegal de litigios y práctica desautorizada de la profesión.[20] El Tribunal Supremo de Apelaciones de Virginia sostuvo el *injunction.* El asunto escaló hasta el Tribunal Supremo federal, donde comparecieron como *amicus curiae* la ABA y otros Colegios de Abogados en favor de la confirmación del dictamen.[21]

El Tribunal Supremo federal revocó la determinación recurrida y reiteró que el *injunction* infringía los derechos garantizados por la Primera y Decimocuarta Enmienda. Íd., pág. 5. Estableció que el derecho de los miembros a

---

[20] El dictamen impugnado por la Hermandad de Trabajadores de los Ferrocarriles le prohibía:

> [F]rom holding out lawyers selected by it as the only approved lawyers to aid the members or their families; […] or in any other manner soliciting or encouraging such legal employment of the selected lawyers; […] and from doing any act or combination of acts, and from formulating and putting into practice any plan, pattern or design, the result of which is to channel legal employment to any particular lawyer or group of lawyers […]. Brotherhood of Railroad Trainmen v. Virginia, 377 US 1, 4-5 (1964).

[21] J. B. Tomes, *supra*, págs. 28-29; J. L. Maute, *supra*, pág. 918. Véase, además, In re Nachman y Feldstein, 97 DPR 899, 940 (1969) (*Resolución*) (Santana Becerra, J., voto disidente) el cual discutiremos en detalle más adelante.

consultarse entre ellos necesariamente incluía el derecho a seleccionar un portavoz que les brindara su consejo, y que, precisamente, ese era el rol de los asistentes del Departamento de Asesoría Legal.  ("[T]he right of the workers personally or through a special department of their Brotherhood to advise concerning the need for legal assistance —and, most importantly, what lawyer a member could confidently rely on— **is an inseparable part of this constitutionally guaranteed right to assist and advise each other**").  (Énfasis nuestro).  Íd., pág. 6.  Añade la opinión que:

> A State could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest. **Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries, […] and for them to associate together to help one another to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics. The State can no more keep these workers from using their cooperative plan to advise one another than it could use more direct means to bar them from resorting to the courts to vindicate their legal rights. The right to petition the courts cannot be so handicapped**.
>
> .   .   .   .   .   .   .   .
>
> **The Brotherhood's activities fall just as clearly within the protection of the First Amendment. And the Constitution protects the associational rights of the members of the union precisely as it does those of the NAACP.**
>
> **We hold that the First and Fourteenth Amendments protect the right of the members through their Brotherhood to maintain and carry out their plan for advising workers who**

**are injured to obtain legal advice and for
recommending specific lawyers.** Since the part
of the decree to which the Brotherhood objects
infringes those rights, **it cannot stand;** and
to the extent any other part of the decree
forbids these activities **it too must fall.
And, of course, lawyers accepting employment
under this constitutionally protected plan
have a like protection which the State cannot
abridge.** (Énfasis suplido). <u>Íd.</u>, págs. 7-8.

La norma reseñada fue determinante para que los Colegios de Abogados y la ABA se comprometieran a modernizar sus cánones y aunaran esfuerzos para crear programas de servicios legales subsidiados con fondos gubernamentales en aras de mejorar el acceso de servicios legales por parte de la clase media.[22]

Posteriormente, en <u>United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n</u>, 389 US 217 (1967), el Tribunal Supremo federal ratificó las normas establecidas en <u>NAACP v. Button</u>, *supra* y <u>Brotherhood of Railroad Trainmen v. Virginia</u>, *supra.*

En este caso el Colegio de Abogados del Estado de Illinois solicitó un *injunction* al foro primario estatal en contra de la *United Mine Workers* (Unión) por incurrir en una alegada práctica ilegal de la abogacía consistente en emplear de forma asalariada a un abogado licenciado para que representara a sus miembros y familiares en reclamaciones por accidentes laborales bajo las leyes estatales. El foro primario concedió el *injunction* solicitado. A su vez, el Tribunal Supremo de Illinois confirmó el dictamen y rechazó

---

[22]   J. L. Maute, *supra*, pág. 919.

así la posición de la Unión de que la prohibición de su modelo de práctica coartaba la libertad de palabra, de reunión y de petición de reparación de agravios de las Enmiendas Primera y Decimocuarta. Dicho foro fundamentó su dictamen en una interpretación restrictiva de las anteriores opiniones del TSEU. Dispuso que la norma prevaleciente protegía sólo a los planes de organizaciones intermediarias que referían sus miembros a abogados, pero no se extendía a las entidades que explícitamente contrataban abogados como empleados y pagaban sus salarios con fondos de la Unión. United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n, *supra*, pág. 221. De manera similar, ciñó la aplicación de la norma a casos caracterizados principalmente por alguna forma de expresión política. Íd.

El Tribunal Supremo federal revocó el dictamen y, entre otras expresiones, consignó que, al igual que en los casos anteriormente resueltos por dicha Curia, el presente versaba sobre una práctica que había operado exitosamente por décadas en beneficio de los miembros de la Unión. Íd., pág. 219. Explicó que el programa evitaba que los intereses de los unionados se vieran afectados. Íd. Previo a su implementación, los miembros que entablaban reclamaciones se veían forzados a pagar entre un cuarenta (40) o cincuenta (50) por ciento de las cuantías recibidas por los daños sufridos en honorarios para sus abogados. Íd. Asimismo, el TSEU pormenorizó los hechos no controvertidos

relacionados a la operación del Departamento de Legal de la

Unión, a saber:

> […] The Union employs one attorney on a salary basis to represent members and their dependents in connection with claims for personal injury and death under the Illinois Workmen's Compensation Act. The terms of the attorney's employment, as outlined in a letter from the acting president of the Union to the present attorney, include the following specific provision: 'You will receive no further instructions or directions and have no interference from the District, nor from any officer, and your obligations and relations will be to and with only the several persons you represent.' The record shows no departure from this agreement. The Union provides injured members with forms entitled 'Report to Attorney on Accidents' and advises them to fill out these forms and send them to the Union's legal department. There is no language on the form which specifically requests the attorney to file with the Industrial Commission an application for adjustment of claim on behalf of the injured member, but when one of these forms is received, the attorney presumes that it does constitute such a request. The members may employ other counsel if they desire, and in fact the Union attorney frequently suggests to members that they can do so. In that event the attorney is under instructions to turn the member's file over to the new lawyer immediately.
>
> The applications for adjustment of claim are prepared by secretaries in the Union offices, and are then forwarded by the Secretaries to the Industrial Commission. After the claim is sent to the Commission, the attorney prepares his case from the file, usually without discussing the claim with the member involved. The attorney determines what he believes the claim to be worth, presents his views to the attorney for the respondent coal company during prehearing negotiations, and attempts to reach a settlement. If an agreement between opposing counsel is reached, the Union attorney will notify the injured member, who then decides, in light of his attorney's advice, whether or not to accept the offer. If no settlement is reached, a hearing is held before the Industrial

> Commission, and unless the attorney has had
> occasion to discuss a settlement proposal with
> the member, this hearing will normally be the
> first time the attorney and his client come
> into personal contact with each other. It is
> understood by the Union membership, however,
> that the attorney is available for conferences
> on certain days at particular locations. The
> full amount of any settlement or award is paid
> directly to the injured member. The attorney
> receives no part of it, his entire
> compensation being his annual salary paid by
> the Union. Íd., págs. 219-221.

En conclusión, el Tribunal Supremo federal decretó en este caso que los derechos a la libertad de expresión, asociación y para peticionar al gobierno la reparación de agravios, garantizados por la Primera y Decimocuarta Enmienda, confieren a la Unión la facultad de contratar un abogado de forma asalariada para asistir legalmente a sus miembros. Íd., págs. 221-222 ("We hold that the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights."). Descartó categóricamente que el derecho de las organizaciones de procurar asistencia legal para sus miembros aplicara únicamente a causas relacionadas con expresiones políticas o religiosas. Íd., pág. 223. De este modo, consignó que la garantía de la Primera y la Decimocuarta Enmienda al derecho de expresión y asociación se extiende a causas de naturaleza secular, por considerar que la protección de estos derechos no está confinada a ningún área de interés humano en particular. Íd. Así, dispuso lo siguiente:

> We think that both the Button and
> Trainmen cases are controlling here. The
> litigation in question is, of course, not
> bound up with political matters of acute
> social moment, as in Button, but the First
> Amendment does not protect speech and assembly
> only to the extent it can be characterized as
> political. **'Great secular causes, with small
> ones, are guarded. The grievances for redress
> of which the right of petition was insured,
> and with it the right of assembly, are not
> solely religious or political ones. And the
> rights of free speech and a free press are not
> confined to any field of human interest.** <u>Íd.</u>

A su vez, el Tribunal Supremo federal también invalidó el dictamen inferior en la medida en que calificó como ilegal cualquier tipo de conexión financiera entre la Unión y los abogados, por aquella referir sus participantes a los letrados. <u>Íd.</u>, pág. 225. El TSEU expresó que esa determinación limitaba sustancialmente el derecho de la Unión sin que ello fuera necesario para proteger el interés del Estado de mantener altos estándares de eticidad en la profesión legal. Por cuanto, concluyó que prohibir todo vínculo económico entre abogados y la Unión tampoco se sostenía en derecho. <u>Íd.</u> ("Since the operative portion of the decree prohibits any financial connection between the attorney and the Union, the decree cannot stand; and to the extent any other part of the decree forbids this arrangement it too must fall.").

Por último, en el 1971, el TSEU resolvió el caso de <u>United Transportation Union v. Michigan Bar</u>, 401 US 576 (1971), por medio del cual reiteró la normativa previamente reseñada. Aquí, la Hermandad de Trabajadores de los Ferrocarriles (Brotherhood of Railroad Trainmen;

posteriormente, fusionada en la Unión del Trasporte Unido, por lo que la llamaremos en adelante, la Unión) tenía como propósito asistir a sus miembros, sus viudas o familiares para que se protegieran de algunos abogados incompetentes que cobraban honorarios excesivos al entablar sus reclamaciones por daños, al amparo de la legislación federal. Íd., págs. 577-578. La Unión estaba ubicada en Michigan, pero tenía como práctica recomendar abogados de Chicago con los cuales habían suscrito acuerdos para que cobraran honorarios —incluyendo gastos— de no más de veinticinco (25) por ciento de la cuantía que eventualmente se obtuviera en el pleito. De igual modo, se reembolsaban los gastos incurridos por los representantes de la Unión que transportaban a los miembros lesionados o a sus familiares a las oficinas de estos abogados. Íd., pág. 578.

Así las cosas, el Colegio de Abogados del Estado de Michigan presentó una acción ante el foro primario del Estado para prohibir esa práctica. Dicho foro emitió un *injunction* en contra de la Unión y fundamentó su decisión en un estatuto que catalogaba esa conducta como un delito menos grave. La Unión apeló la determinación ante la Corte Suprema de Michigan. En el ínterin, el TSEU resolvió los casos de Brotherhood of Railroad Trainmen v. Virginia, *supra*, y United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n, *supra*. No obstante, tras varios trámites procesales, la Corte Suprema de Michigan confirmó la prohibición al interpretar de manera muy limitada las opiniones del TSEU.

Circunscribió su análisis al lenguaje de los *injunctions* de esos casos*,* en lugar de aquilatar en el proceso las protecciones garantizadas por la Primera Enmienda. United Transportation Union v. Michigan Bar, *supra*, pág. 580.

Eventualmente, el Tribunal Supremo federal revocó la determinación de la Corte Suprema de Michigan y concluyó, en lo pertinente, que el dictamen era demasiado amplio al prohibirle a la Unión que brindara o proporcionara asesoramiento legal a sus miembros o a los familiares de estos. Íd. El TSEU enfatizó que ese tipo de lenguaje era contrario a la normativa expresamente establecida tanto en NAACP v. Button, *supra*, como en United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n, *supra*, por lo que anuló el dictamen en la medida que perjudicaba el ejercicio de libertades protegidas. Íd., pág. 581.

Del mismo modo, el Tribunal Supremo federal sostuvo que la práctica de los representantes de la Unión de transportar miembros lesionados a las oficinas de los abogados referidos estaba dentro del alcance de la protección constitucional, dado que la Primera Enmienda, precisamente, les concedía a los unionados ese derecho de asistirse mutuamente en la búsqueda de representación legal efectiva. Íd., pág. 582.

En conclusión, el Tribunal Supremo federal categóricamente catalogó como un **derecho fundamental protegido por la Primera Enmienda** el acometer actividades colectivas para obtener acceso significativo a los tribunales. En detalle, el TSEU declaró lo siguiente:

> In the context of this case we deal with a cooperative union of workers seeking to assist its members in effectively asserting claims under the FELA. **But the principle here involved cannot be limited to the facts of this case.** <u>**At issue is the basic right to group legal action**</u>, a right first asserted in this Court by an association of Negroes seeking the protection of freedoms guaranteed by the Constitution. **The common thread running through our decisions in NAACP v. Button, Trainmen, and United Mine Workers is that** <u>**collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment**</u>. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation. That was the holding in United Mine Workers, Trainmen, and NAACP v. Button. (Negritas y subrayado nuestro). <u>Íd.,</u> págs. 585-586.

### ii. Puerto Rico

En la jurisdicción local, de manera ilustrativa, reseñamos una opinión disidente emitida en torno a una *Resolución* de esta Curia en la que se ordenó al Procurador General a presentar una querella en un asunto disciplinario. La opinión disidente abordó en detalle la jurisprudencia federal respecto al derecho a asociarse para procurar representación legal. Veamos.

En el 1966, previo a que se resolviera <u>United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n</u>, *supra*, este Tribunal remitió al Procurador General una queja juramentada en contra de los Lcdos. Harvey B. Nachman y Stanley L. Feldstein en la cual se les imputó haber incurrido en prácticas de solicitación conocidas como perseguidores de ambulancia ("ambulance chasing"). A comienzos del 1967, el Procurador

General sometió su informe acompañado de declaraciones juradas tomadas durante el curso de la investigación. Evaluado el asunto por este Foro, y por versar la presunta conducta antiética con trámites relacionados al Derecho de Almirantazgo, materia de la competencia exclusiva del foro federal, emitimos una *Resolución* para referir el expediente a la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico (Corte de Distrito). A finales del mismo año, la Corte de Distrito nos devolvió el expediente luego de desestimar la queja por insuficiencia de prueba para sostener los cargos disciplinarios.

En el 1969, este Tribunal emitió una *Resolución* ordenándole al Procurador General que presentara una querella en contra de los licenciados Nachman y Feldstein. *In re* Nachman y Feldstein, 97 DPR 899 (1969). En ese momento disintieron del curso de acción elegido por la mayoría de este Tribunal, el entonces Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos, Rigau y Santana Becerra. Éste último emitió una opinión disidente, a la cual se unió el Juez Asociado Hernández Matos. En términos generales, el Juez Asociado Santana Becerra realizó un recuento de las incidencias procesales y de los hechos que surgían del récord que dieron lugar a la referida querella ética. Entendió que el procedimiento disciplinario en contra de los licenciados debió culminar con el archivo de la queja por la Corte de Distrito. Íd., pág. 903 (Santana Becerra, J., voto disidente). Así, entre

otras consideraciones, expresó que el referido ético "constituy[ó] un proceso injustificado, no sólo a la luz de lo anteriormente expuesto, sino también a la luz de todas las demás circunstancias en el récord que pudieran relacionarse con esa conducta profesional tan difícil de concretar bajo criterios precisos que caracterizan al abogado como un cazador de ambulancias". Íd. Asimismo, consideró que no había base para determinar causa probable para enjuiciar disciplinariamente a los licenciados **"a la luz de las normas de derecho que se imputan infringidas"**. (Énfasis nuestro). Íd., pág. 904. Consecuentemente, procedió a describir en detalle el cuadro fáctico que dio curso a la investigación y posterior querella.

En lo pertinente, destacó que la Corte de Apelaciones del Primer Circuito determinó que los obreros que sufrieron lesiones a bordo de un barco en aguas territoriales de Puerto Rico tenían una causa de acción sustantiva en Derecho de Almirantazgo para reclamar por sus lesiones. Ello, dio lugar a que aquellos obreros afectados trataran de tramitar sus reclamaciones antes de que sus respectivas causas de acción se vieran afectadas por incuria o por prescripción. Íd., págs. 905-906. El licenciado Nachman fue unos de los abogados pertenecientes a la firma de Nueva York (Golenbock y Komoroff) que litigó el caso antes mencionado.

En atención a ello, para el año 1961 los licenciados Nachman y Feldstein se situaron en Puerto Rico, ejerciendo bajo el bufete del mismo nombre (Nachman y Feldstein o el

Bufete), y se dedicaron mayormente a atender un gran volumen de casos de obreros lesionados en los muelles. A su vez, contrataron investigadores quienes estaban a cargo de "tomar declaraciones a testigos, llevar personas a exámenes médicos, notificaban emplazamientos y citaciones, se comunicaban con los clientes, y también le servían de chofer y de mensajeros". Íd., pág. 906. La práctica del Bufete cubría toda la Isla, aunque la mayoría de los casos provenían del Área Metropolitana.

Previo a formar el Bufete, el licenciado Feldstein conoció al presidente de la Unión de Trabajadores de Muelles (Unión de Trabajadores). La Unión de Trabajadores refería casos de obreros lesionados al Bufete, coordinaba entrevistas y les permitía tanto a los investigadores como a los licenciados utilizar sus distintos locales para tomar las declaraciones de los obreros lesionados. Como la mayoría de los testigos eran conocidos por sus apodos, era necesario tener que acudir a los locales de la Unión de Trabajadores para tratar de localizarlos. Íd., págs. 909-910. En ocasiones, los licenciados llamaban al presidente de la Unión de Trabajadores para que le informara a los testigos en que fecha próxima iban a pasar por algún local para entrevistarlos. Incluso, ordenaba que colocaran los nombres en una pizarra de forma tal que estos quedaban apercibidos de la futura visita de los licenciados o sus investigadores. El anterior cuadro operacional del Bufete —según el relato de los querellados—, no sólo les

representaba una economía de tiempo y recursos, sino que también beneficiaba a los obreros, ya que no perdían turnos de trabajo por tener que viajar al Área Metropolitana y, más aún, porque "[s]encillamente estos [] no tenían con qu[é] pagar [porque] [v]ivían de un turno a otro turno". Íd., pág. 912. Los obreros "tenían casos de 3, 4, 5 años de ocurridos. No [] recordaban las fechas, ni se recordaban del barco, ni se recordaban de los testigos, pero la evidencia del accidente la llevaban encima, sus incapacidades". Íd., págs. 923-924.

Tras examinar el relato de los querellados, el Juez Asociado Santana Becerra hizo referencia a dictámenes del Tribunal Supremo federal por entender que "en esencia y espíritu, [eran] aplicables a la situación del caso presente, en las circunstancias de sus hechos". Íd., págs. 939-940. Por cuanto procedió a discutir los casos de Brotherhood of Railroad Trainmen v. Virginia, *supra*; NAACP v. Button, *supra*; y United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n, *supra*. Finalmente, el Juez Asociado Santana Becerra ultimó que no hubo conducta antiprofesional que justificara la querella presentada en contra de los licenciados. En particular, expresó como razones para su disenso que:

> i. Siendo el bufete a que pertenecían estos abogados el que produjo la norma de derecho que reconoció a infinidad de obreros lesionados a bordo de barcos sitos en las aguas territoriales de Puerto Rico una causa de acción en almirantazgo en el foro exclusivo federal, era lógico, e inevitable, que todos

aquellos interesados buscaran su intervención y sus servicios profesionales.

ii. Era lógico, e inevitable, que hubiera una gran acumulación de reclamaciones a la vez, sobre todo ante el peligro de la prescripción o de la incuria bajo las normas de almirantazgo.

iii. Estando unionados estos obreros, y estando repartidos a través de todos los puertos de Puerto Rico, y habiendo un solo foro en todo Puerto Rico donde litigar, era lógico e inevitable que hubiera relación entre la Unión o Uniones a que pertenecían estos obreros reclamantes, los líderes de dichas Uniones y estos abogados querellados.

iv. **Bajo los casos citados, ellos, los obreros, y los abogados, tenían un derecho constitucional a esta relación y comunicación, y constitucionalmente tenían ellos, los obreros, y sus abogados, el derecho a usar de aquellos mecanismos de relación y de comunicación que permitieran del modo más eficaz el tramitar esas reclamaciones**, tanto para que no se perdiera ninguna por falta de la debida información y obtención de prueba y de testigos, como para evitar, en las circunstancias en que ocurrieron los hechos, la presentación de reclamaciones falsas o fabricadas. Las declaraciones de los abogados querellados explican a satisfacción la necesidad de estos mecanismos de comunicación, para protección también de ellos mismos contra de engaño o la falsa información, que dicho sea, no los crearon ellos, sino que ya estaban aquí creados esos mecanismos por la firma de abogados de Nueva York que litigaba casos de obreros en la Corte Federal.

v. Ante una litigación de clase que afectaba, y en la cual tenía interés una gran masa de obreros, sería un puro candor esperar que cada obrero, sin comunicarse o relacionarse con los otros unionados y sus líderes, fuera por sí solo a presentar su reclamación. La experiencia demuestra que eso no ocurre así, ni ha ocurrido en relación con los pleitos obreros y de unionados que se han litigado en nuestras cortes. […] (Énfasis nuestro). Íd., págs. 944-945.

Otro punto que es importante resaltar de la opinión disidente del Juez Asociado Santana Becerra es que reconoció el gran beneficio social que promovían los servicios legales grupales y prepagados.   Explicó que:

> Aparte de su legítimo derecho a recibir honorarios como consecuencia de la profesión que ejercen, las circunstancias del récord me convencen [de] que **los querellados realizaron una labor social en defensa del derecho de muchos obreros y trabajadores, varios de ellos mutilados como consecuencia de lesiones del trabajo, a obtener una legítima compensación que las leyes del Congreso les concedía, y que no se les había hecho valer.**
>
> Ante una norma sobre conducta profesional imprecisa y vaga, que por serlo, en determinadas situaciones puede funcionar de manera acomodaticia, y que se quiere, tardíamente, reivindicar ahora después del transcurso de varios años, **para mí el balance de conveniencia está en esa labor profesional que resultó en gran beneficio de una clase pobre y humilde de litigantes, más necesitada que nadie de asistencia profesional en las circunstancias en que la obtuvo en este caso y que no la encuentra en otras esferas sociales porque no tiene acceso a ellas.** (Énfasis suplido). Íd., págs. 946-947.

El Juez Asociado Santana Becerra concluyó su opinión disidente recalcando que, a su mejor entender, el proceso seguido en contra de los licenciados involucraba "**amenaza de sanciones en un área constitucionalmente protegida,** sin que [d]el récord [surgiera] suficiente base para hallar causa probable de una práctica profesional prohibida". (Énfasis suplido). Íd., pág. 947.**23**

---

**23**   Vale destacar que, en el 1970, la querella fue desestimada por esta Curia luego de concluir que la prueba era insuficiente para sostener los cargos imputados.   Véase *In re* Nachman y Feldstein, 98 DPR 929 (1970).

Cónsono con la normativa descrita, en lo concerniente a nuestra jurisdicción, es indispensable destacar que la Carta de Derechos de la Constitución de Puerto Rico, al igual que la de la Constitución de los Estados Unidos, salvaguarda los derechos de libertad de palabra, prensa, asociación y para "pedir al gobierno la reparación de agravios". Art. II, Sec. 4, Const. PR, LPRA, Tomo 1. Además, asegura el derecho de las personas a "asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. PR, LPRA, Tomo 1. Asimismo, prohíbe que las personas sean privadas de su libertad o propiedad sin debido proceso de ley y les garantiza la igual protección de las leyes. Art. II, Sec. 7, Const. PR, LPRA, Tomo 1.

Teniendo presente el marco de derecho antes reseñado, procedemos a resolver.

### III. Análisis

Primeramente, nos corresponde determinar si la OCS se excedió en las facultades consagradas en su estatuto habilitador al considerar la práctica establecida por CODEPOLA como un negocio de seguros. Examinemos.

Es un principio establecido en el Derecho Administrativo, que las agencias no cuentan con discreción para asumir jurisdicción donde no la tienen. Sólo poseen autoridad para actuar dentro del marco de su ley orgánica; de lo contrario, su actuación será *ultra vires*, es decir, nula.

En este caso, la OCS emitió una *Orden de cese y desista* en contra de CODEPOLA, esencialmente, por entender que ésta se dedicaba a la venta desautorizada de seguros. Ahora bien, la entidad gubernamental sólo podía asumir jurisdicción sobre los planes de servicios legales grupales y prepagados, siempre y cuando su estatuto habilitador así lo estableciera manifiestamente. Sin embargo, tras un análisis minucioso del Historial Legislativo y las disposiciones pertinentes del Código de Seguros no hallamos cláusula alguna que le concediera esa facultad.

Surge del referido Historial Legislativo que, con la adopción del nuevo Código de Seguros, los poderes del Comisionado se ampliaron y fortalecieron, y, además, se definió de forma "más precisa y abarcadora el concepto de lo que es seguro". Diario de Sesiones, *supra*, pág. 562. A pesar de incorporarse los servicios médicos y hospitalarios a base de cuotas, dicho cuerpo legal nada consignó con respecto a los planes de GPLS. Más aún, actualmente, tras múltiples enmiendas al Código de Seguros, los planes de GPLS no han sido insertados al mismo ni regulados expresamente en nuestro ordenamiento jurídico.

Es un hecho incontrovertido que CODEPOLA en algún momento, por error o inadvertencia, catalogó sus servicios como un seguro. Sin embargo, al realizar un examen integral de las circunstancias que rodean una controversia, en múltiples ocasiones hemos validado el axioma de que "el nombre no hace la cosa". Véanse Calderón Frader v. ELA, 196

DPR 984, 988 (2016); Batista, Nobbe v. Jta. Directores, 185 DPR 206, 224 (2012); Borschow Hosp. v. Jta. de Planificación, 177 DPR 545, 567 (2009). Ese es el caso ante nosotros. Más bien, consideramos que los servicios que la peticionaria provee están enmarcados dentro de la modalidad de servicios legales grupales y prepagados. Esto es así, ya que, a pesar de que podría considerarse que su plan de GPLS posee rasgos similares al negocio de seguros, no cuenta con las características esenciales de procurar indemnizar daños ocasionados por eventos fortuitos ni de asumir riesgos de pérdida con el compromiso de asegurar contra la misma.

El plan de CODEPOLA esencialmente procura facilitar a sus miembros representación legal adecuada y accesible. Ésta, a pesar de cobrar por una membresía a cambio de ofrecer asistencia y asesoría legal, no es quien finalmente prestará los servicios profesionales. Surge del expediente que la peticionaria cubre la necesidad de servicios legales de sus miembros a través de su División Legal o por medio de referidos a otros abogados asociados, quienes finalmente asumen la representación. Es decir, CODEPOLA es una compañía que se dedica principalmente a promocionar y referir a sus miembros a abogados de su confianza, ya sean parte de su División Legal o asociados.

Notamos, además, que el propósito perseguido por la peticionaria es cónsono con los orígenes históricos de esta forma de representación legal que ha buscado atender la necesidad de servicios legales de los miembros de una

organización, a través de abogados cuyas tarifas son más económicas, y de este modo fomentar el acceso a la justicia de los sectores pobres y de la clase media, al disminuir los gastos de litigación.[24] A esos efectos, cabe señalar que los gastos de contratación de abogados y de litigación han sido catalogados como una de las "principales barreras que se entrecruzan con otras para provocar la impenetrabilidad al sistema de justicia". Estrella Martínez, *supra*, pág. 20.

Tampoco debemos interpretar el término "beneficio" que aparece en el Art. 1.020 del Código de Seguros, *supra*, como sugiere la OCS. Entender que la asistencia que brinda CODEPOLA a sus miembros es un "beneficio", según contemplado en el Código de Seguros, es obviar que el aludido "beneficio" no es otra cosa que el **derecho fundamental de arraigo constitucional a asociarse para procurar representación legal, según establecido indiscutiblemente por el Tribunal Supremo federal**. United Transportation Union v. Michigan Bar, *supra*, pág. 585. El mismo está amparado en los derechos a la libertad de expresión, asociación y para peticionar al gobierno la reparación de agravios, consagrados en la Primera y Decimocuarta Enmienda de la Constitución de los Estados Unidos. Emdas. I, XIV, Const. EE. UU., LPRA, Tomo 1; United Transportation Union v. Michigan Bar, *supra*; United Mine W. of A., Dist. 12 v. Illinois St. Bar Ass´n, *supra*; Brotherhood of Railroad Trainmen v. Virginia, *supra*;

---

[24] J. B. Tomes, *supra,* pág. 26.

NAACP v. Button, *supra*. Véase, además, Art. II, Secs. 4, 6, 7, Const. PR, LPRA, Tomo 1.

De esta forma, el derecho a asociarse para procurar representación legal, por considerarse como una de las libertades fundamentales protegidas por la cláusula del debido proceso de ley, en su vertiente sustantiva, aplica a nuestra jurisdicción por su propia fuerza o efecto; es decir, *ex proprio vigore*. Torres v. Puerto Rico, 442 US 465, 469-471 (1979); Examining Bd. v. Flores de Otero, 426 US 572, 599-601 (1976); Caledo-Toledo v. Pearson Yacht Leasing Co., 416 US 663, 668 esc. 5 (1974); Balzac v. Porto Rico, 258 US 298, 312-313 (1922); Downes v. Bidwell, 182 US 244, 283-284 (1901). Véanse además, de manera ilustrativa: Charbonier Laureano y otros v. Gobernador, 193 DPR 516 (2015) (*Resolución*); E. Chemerinsky, Constitutional Law: Principles and Policies, 5th ed., Nueva York, Wolters Kluwer, 2015, págs. 531-532.

Así, en ausencia de legislación que lo establezca específicamente, no podemos considerar los planes de GPLS como un seguro ni, razonablemente, reconocerle a la OCS autoridad para regularlos. Por tanto, concluimos que la emisión de la referida *Orden de cese y desista* por parte del organismo administrativo constituyó una actuación *ultra vires* y, consecuentemente, nula.

Por otra parte, la OCS sostuvo que la membresía ofrecida por CODEPOLA a sus miembros no podía catalogarse como un contrato de servicios profesionales legales mediante iguala.

Inicialmente, es meritorio cualificar las distintas relaciones contractuales concebidas dentro de su plan de GPLS; a saber: (1) la relación entre CODEPOLA y los miembros, (2) el acuerdo entre CODEPOLA y los abogados, y (3) la eventual relación entre los abogados y los miembros. **Nuevamente, determinamos que para todas y cada una de esas relaciones contractuales, actualmente, la OCS carece de autoridad legal para reglamentarlas.**

Con respecto a las primeras dos, esto es así debido a que su estatuto habilitador no la faculta para ello. Por consiguiente, como expresáramos, la *Orden de cese y desista* en cuestión es nula por ser producto de una actuación desautorizada de la agencia. Ahora bien, destacamos que los acuerdos dos y tres antes descritos, por involucrar a representantes legales en esta nueva modalidad del ejercicio de la profesión jurídica, están sujetos a nuestro poder inherente y exclusivo de reglamentación. *In re* Aprobación del Reglamento para la Asignación de Abogados y Abogadas de Oficio de      Puerto Rico, 2018 TSPR 173, 201 DPR ____ (2018); *In re* Enmda. R. 12(F) Reglamento TS, 193 DPR 321 (2015); *In re* Gervitz Carbonell, 162 DPR 665 (2004); In re Peña Peña, 153 DPR 642 (2001); *In re* Freytes Mont, 117 DPR 11 (1986); *In re* Liceaga, 82 DPR 252 (1961).

Debemos resaltar que del expediente ante nosotros únicamente surge el contrato de servicios de la peticionaria con sus miembros. No obra en autos el contrato suscrito por CODEPOLA con los abogados ni el acuerdo entre los abogados

y los miembros. Por cuanto, al no encontrarse ante nosotros algún sujeto éticamente disciplinable, sólo nos resta reconocer el derecho constitucional de las organizaciones intermediarias, sus miembros y los abogados a asociarse con el fin lícito y legítimo de procurar asistencia legal. Por ello, decretamos que, bajo la doctrina antes reseñada, tanto CODEPOLA como sus miembros gozan del derecho fundamental a asociarse para contratar abogados de forma asalariada o mediante contratos de iguala, incluso costeados por la entidad, para que les asistan en la defensa de sus derechos.[25]

Lo anterior, sin embargo, no debe interpretarse como una carta en blanco para que los abogados que pacten con este tipo de organizaciones intermediarias claudiquen a su deber de ejercer la profesión legal siguiendo los más altos estándares éticos. Para ello, el letrado deberá asegurarse, previo a contratar con las referidas entidades, que éstas, entre otros aspectos: (1) no interfieran indebidamente con el ejercicio independiente de su criterio profesional; (2) no obstaculizan su deber de desempeñar la profesión competentemente; (3) preservan las confidencias de los miembros; (4) evitan los conflictos de intereses; (5) su plan operacional no involucra prácticas impropias de

---

[25] No debemos perder de perspectiva que CODEPOLA es una corporación debidamente organizada bajo las leyes del Gobierno de Puerto Rico y autorizada para realizar o promocionar "cualquier negocio **o propósito lícito**", como lo es la defensa del derecho a portar armas de fuego, el cual está consagrado en la Segunda Enmienda de la Carta de Derechos de la Constitución de los Estados Unidos.  (Énfasis suplido). Art. 1.01, Ley General de Corporaciones de 2009, Ley Núm. 164-2009, 14 LPRA sec. 3501(b); Enmda. II, Const. EE. UU., LPRA, Tomo 1.

publicidad, solicitación o de distribución y división de honorarios; y (6) cumplan con las leyes y reglamentos aplicables.[26]

Recapitulando, la actuación de la OCS resultó ineficaz por lo que no procede brindar deferencia a la determinación administrativa bajo consideración en este recurso. Conforme a los principios constitucionales relevantes, sólo probando un interés público apremiante, podía el Estado coartar el derecho fundamental a asociarse para procurar representación legal que hoy reconocemos. Sin embargo, en este caso, el aparente interés de la OCS de proteger la industria de seguros —al intentar reglamentar como un seguro el plan de servicios legales grupales y prepagados de CODEPOLA— se desvanece ante la ausencia de disposición que la faculte en ley para ello.

Por los fundamentos antes esbozados, se revoca la *Sentencia* del Tribunal de Apelaciones emitida el 28 de febrero de 2017 y la *Resolución* emitida por la OCS el 13 de junio de 2016, que validó la *Orden de cese y desista* en contra de CODEPOLA del 2 de diciembre de 2015.

Se dictará *Sentencia* de conformidad.

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

---

[26] Véase *ABA/BNA Lawyers´s Manual on Professional Conduct*, Formal Op. 87-355 (1987).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Comisionado de Seguros de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Corporación para la Defensa del Poseedor de Licencia de Armas de Puerto Rico, Inc.<br><br>Peticionario | CC-2017-423 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 21 de junio de 2019.

Por los fundamentos expuestos en la *Opinión* que antecede, la cual se hace formar parte íntegra de la presente *Sentencia*, revocamos la *Sentencia* del Tribunal de Apelaciones emitida el 28 de febrero de 2017 y la *Resolución* emitida por la Oficina del Comisionado de Seguros de Puerto Rico el 13 de junio de 2016, que validó la *Orden de cese y desista* en contra de la *Corporación para la Defensa del Poseedor de Licencia de Armas de Puerto Rico, Inc.,* del 2 de diciembre de 2015.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión Concurrente a la cual se unió la Juez Asociada señora Rodríguez Rodríguez.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Comisionado de Seguros de
Puerto Rico

       Recurrido

CC-2017-0423 ᵛ·

Corporación para la Defensa
del Poseedor de Licencia de
Armas de Puerto Rico, Inc.

       Peticionario

*Certiorari*

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión concurrente a la cual se une la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 21 de junio de 2019.

Estoy de acuerdo con el resultado al que llega la mayoría. No obstante, concurro con la Opinión por entender que la discusión constitucional que se incluyó contraviene la doctrina de autolimitación judicial que impera en nuestro ordenamiento. La controversia en este caso se debió limitar a determinar si los servicios de representación legal que ofrece la Corporación para la Defensa del Poseedor de Licencia de Armas de Puerto Rico, Inc. (CODEPOLA) a sus miembros constituyen una venta desautorizada de un seguro. A esos efectos, este Tribunal podía concluir que el ofrecimiento de esos servicios **no es un seguro** debido a que, como se indica correctamente en la Opinión: (1) el servicio "no cuenta

con las características esenciales de procurar indemnizar daños ocasionados por eventos fortuitos ni de asumir riesgos de pérdida con el compromiso de asegurar la misma"[27] y (2) el Código de Seguros de Puerto Rico, 26 LPRA secs. 101-4327, no regula expresamente los planes grupales y prepagados de servicios legales.

No obstante, una Mayoría del Tribunal se embarcó en un análisis constitucional innecesario, obviando las normas de autolimitación y prudencia en el ejercicio del Poder Judicial. Aún más preocupante, la mayoría resolvió la controversia a base de un argumento que ninguna de las partes alegó y sobre el cual no tuvieron la oportunidad de expresarse.

I

Tras recibir una solicitud de investigación de aseguradora sin licencia, la Comisionada de Seguros (OCS) investigó los servicios de representación legal que ofrece CODEPOLA a sus miembros.[28] Luego de que las partes acordaran someter el caso por memorandos de derecho, la OCS emitió una *Orden de Cese y Desista*, en virtud de la facultad que le confiere el Artículo 2.150 del Código de Seguros, 26 LPRA sec. 247. Concluyó que "la cobertura de servicios legales ofrecidas por CODEPOLAPR, por sus términos, constituye un contrato de seguros de conformidad con lo dispuesto en el Artículo 1.020 del Código de Seguros" y "las actuaciones de CODEPOLAPR al ofrecer dicha

---

[27] *Opinión mayoritaria*, págs. 48-49.

[28] Entre estos, asesoría y asistencia legal 24/7, representación legal en acusaciones donde se haya utilizado el arma de fuego en legítima defensa, en casos administrativos de revocación de licencia de armas, en casos judiciales y administrativos de ocupación de armas y licencias por delitos, querellas y creencias de negligencia y declaraciones juradas para renovaciones de licencias de armas, cambios de categorías de licencia y solicitudes de duplicados de licencia. *Resolución de la OCS*, Apéndice, pág. 110.

cobertura constituye la tramitación de seguros de conformidad con lo dispuesto en el Artículo 1.050 de dicho código".[29]

Inconforme, CODEPOLA solicitó reconsideración a la Comisionada de Seguros, quien confirmó la orden de la OCS. El Tribunal de Apelaciones confirmó a la Comisionada y la OCS. Aún en desacuerdo, CODEPOLA plantea ante este Tribunal que el Artículo 1.020 del Código de Seguros, infra, era extraordinariamente vago y amplio en su aplicación de forma que prohibía cualquier actividad legítima de servicios en violación al debido proceso de ley.[30] Este planteamiento en torno a la aplicación de la definición del contrato de seguro **fue el único argumento constitucional que discutió CODEPOLA.**

Por su parte, la OCS sostiene que el contrato que ofrece CODEPOLA a sus miembros es un contrato de seguro debido a que esta se obliga a indemnizar a otra parte (miembro), a proveerle un beneficio específico o determinable (defensa y gastos de servicios legales y notaría, según sea el caso), al producirse un suceso incierto previsto en el mismo (necesidad de representación legal por algún cuestionamiento en cuanto a la legítima tenencia de su arma o de su desempeño en el uso legítimo de esta).[31]

En consideración a lo expuesto, la controversia de referencia requería evaluar únicamente si el Código de Seguros **reglamenta** los servicios legales que ofrece CODEPOLA, y que igualmente ofrecen otras organizaciones y uniones a sus miembros. Este tipo de servicio no está cobijado bajo el

---

[29] *Orden de cese y desista*, Apéndice, pág. 17.
[30] *Certiorari*, pág. 4.
[31] *Alegato de la parte recurrida*, págs. 6-7; *Resolución de la OCS*, Apéndice, pág. 116.

Artículo 1.020, 26 LPRA sec. 102, que define el contrato de seguro como aquel:

> mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio especifico o determinable al producirse un suceso incierto previsto en el mismo. El término seguro incluye reaseguro.

Tampoco está incluido en las clases de seguros, según se definen en el Capítulo 4 del Código de Seguros, 26 LPRA secs. 401-415: seguro de vida, seguro de incapacidad física, seguro de propiedad, seguro contra siniestros marítimos y de transportación, seguro agrícola, seguro de vehículos, seguro contra accidentes, seguro de garantía y seguro de título. Además, el Artículo 4.010 establece que

> [l]a intención es que la protección de ciertos seguros quede comprendida dentro de las definiciones de dos o más clases de seguros, según se expone en este capítulo, y el hecho de que la protección de un seguro esté incluida dentro de una definición no excluirá dicha protección en cuanto a cualquier otra clase de seguro dentro de la definición de la cual la misma pueda razonablemente incluirse del mismo modo. 26 LPRA sec. 401.

En ausencia de una disposición expresa que incorpore los planes grupales prepagados de servicios legales al Código de Seguros, la Comisionada no podía concluir que la práctica de CODEPOLA constituía una venta desautorizada de pólizas de seguro y, mucho menos, emitir una orden de cese y desista en su contra.

**Ante la evidente ausencia de reglamentación por parte del Estado**, no había que adentrarse en una discusión extensa y confusa sobre los planes grupales prepagados de servicios legales, a la luz de los derechos constitucionales de libertad de expresión, asociación y petición de agravios. En cambio, en vez de limitar la controversia al derecho de seguros, la

Mayoría se adentra en una cuestión constitucional que desplaza como asunto secundario lo que debió ser el análisis central del caso. Así, contravienen principios de autolimitación judicial adoptados hace más de seis décadas cuando determinamos que este Tribunal:

> … **no se anticipará a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo.**
>
> … **no formulará una regla de derechos constitucionales más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse.**
>
> … **no juzgará una cuestión constitucional** aunque haya sido sometida propiamente en los autos, **si también se somete un fundamento de otra índole que permita disponer del caso.** <u>ELA v. Aguayo</u>, 80 DPR 552, 596 (1958) (énfasis suplido).

Sobre el tercer principio, vale recalcar que el fundamento constitucional que se utiliza en la ponencia **no se sometió propiamente en los autos.** Como consecuencia, el Estado, en representación de la OCS, no pudo expresarse sobre el análisis constitucional con relación a los planes grupales prepagados de servicios legales que se desarrolló en la Opinión.

Más aún, la conclusión de que "sólo probando un interés público apremiante, podía el Estado coartar el derecho fundamental a asociarse para procurar representación legal"[32] es superflua en la medida en que también se resuelve que el Estado **no reglamentó** los planes grupales prepagados de servicios legales porque no los incorporó al Código de Seguros.

En fin, el análisis constitucional hubiese sido apropiado y necesario si, en efecto, el Estado hubiera reglamentado estos planes y la parte afectada hubiese impugnado tal

---

[32] *Opinión mayoritaria*, pág. 54.

reglamentación. Por tanto, una vez se determinó que los servicios que ofrecía CODEPOLA no constituían un seguro, no había razón alguna para evaluar una controversia constitucional que el propio Tribunal creó.


                              Maite D. Oronoz Rodríguez
                                 Jueza Presidenta